PROSKAUER ROSE
Elise M. Bloom, Esq.
Gregory I. Rasin, Esq.
1585 Broadway
New York, New York  10036
Tel. (212) 969-3000
Fax (212) 969-2900

ROGERS & HARDIN LLP
Hunter R. Hughes, Esq.
J. Timothy Mc Donald, Esq.
Ashley R. Hurst, Esq.
2700 International Tower
Peachtree Center
229 Peachtree Street, N.E.
Atlanta, GA  30303
Tel.  (404) 522-4700
Fax.  (404) 525-2224

Attorneys for Defendants
Sprint Nextel Corporation
and Sprint/United Management
Company

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MELISSA ENG-HATCHER, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.  07-CIV-7350(BSJ)(KNF) |
| SPRINT NEXTEL CORPORATION; SPRINT/UNITED MANAGEMENT COMPANY and DOES 1 through 10, inclusive, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S
## (1) MOTION FOR CONDITIONAL COLLECTIVE CERTIFICATION
## AND (2) MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................. v

I.    **INTRODUCTION** ...................................................................................................... 1

II.    **PROCEDURAL HISTORY** ...................................................................................... 4

III.    **STATEMENT OF FACTS** ......................................................................................... 5

    A.    Plaintiff Melissa Eng-Hatcher Worked for 17 Months as a Sprint Retail Store Consultant. ......................................................................................... 5

    B.    Sprint and the Decentralized Management Structure of Its Retail Stores. ............ 6
        1.    The Employees in Sprint's Retail Stores: Store Managers, Assistant Store Managers, Senior Retail Store Consultants, Retail Store Consultants, Technical Service Representatives, and Store Hosts ............ 7
        2.    Store Managers and District Managers are not Rewarded or Penalized for the Amount of Overtime Expenses Incurred in Their Stores.9

    C.    Sprint's Policies Prohibit Working Off the Clock and Mandate that All Overtime—Even Overtime that was not Pre-Approved—Be Paid. ...................... 10

    D.    Eng-Hatcher's and Her Co-workers' Experiences in Stores 160 and 1185 Differed Greatly. ................................................................................... 14

    E.    Eng-Hatcher and Other Retail Store Consultants Earned a Significant Amount of Overtime Pay. ...................................................................... 15

    F.    The Evidence From Other Store 160 and 1185 Retail Employees Contradicts Eng-Hatcher's Allegations. .................................................. 17

    G.    Eng-Hatcher's Brief Mischaracterizes Much of the Evidence in this Case. ......... 18

IV.    **ARGUMENT AND CITATION OF LEGAL AUTHORITIES** ................................. 22

    A.    Plaintiff has Failed to Satisfy the FLSA's Standards for Conditional Certification Because She has not Shown that She is Similarly Situated to Her Putative Class. .............................................................................. 23
        1.    The Standards for Conditional Certification Under the FLSA. ............... 24

            a.    Plaintiff's contention that the Court should apply an "extremely lenient" standard ignores the Court's discovery plan. ............................................................................ 24

b.    For the Court to conditionally certify Plaintiff's class, she must make a factual showing that she and other similarly situated individuals were victims of a common illegal policy........................................................................ 26

c.    Plaintiff must also show that others are interested in joining this case. ...................................................................... 27

2.    Plaintiff has Failed to Establish That She is Similarly Situated to Her Putative Class Because She has not Shown That They Were Subjected to a Common Illegal Policy........................................ 27

a.    Plaintiff's alleged nationwide de facto policy is meritless. .......... 28

b.    The evidence shows that Sprint has neither an actual nor a de facto policy of not paying overtime. ......................................... 29

3.    Plaintiff's Theory That Sprint has a "de facto" Illegal Policy Does not Make Sense. ......................................................................... 30

a.    Plaintiff's FLSA class definition is inconsistent with her "de facto" policy theory. ................................................ 30

b.    Sprint's incentive-compensation plan is a legal policy that is common to many retail-sales environments.............................. 32

c.    Sprint does not have a nationwide policy of prohibiting overtime, and controlling overtime expenses is both legal and good business. ........................................................ 33

d.    Plaintiff's pressure theory has been rejected by other courts.................................................................... 35

4.    Plaintiff's Claims Are Unsuitable For Collective Action Treatment........ 38

a.    Plaintiff has not demonstrated that others have a sufficient interest in this action. ................................................ 38

b.    Adjudicating putative plaintiffs' off-the-clock claims would require plaintiff-by-plaintiff, store-by-store, fact-specific inquiries.................................................................. 41

5.    Plaintiff's Proposed Notice is Inadequate............................................... 46

B.    Plaintiff's Motion for Certification of a Rule 23 Class Should Be Denied. ......... 47

1.    The Applicable Standard for Rule 23 Certification. .................................. 48

2.  The Rule 23 Class Proposed By Plaintiff Is Overly Broad and Not Ascertainable............................................................................................ 50

3.  Plaintiff Has Failed To Establish That The Proposed Class Is So Numerous That Joinder Of All Members Is Impracticable. .................... 53

4.  Plaintiff Has Failed To Establish Commonality And Typicality............. 55

5.  Plaintiff Is Not An Adequate Class Representative................................. 58

6.  Plaintiff Has Failed to Show That Issues Common to the Class Predominate and That Class Action Is the Superior Method of Adjudication............................................................................................... 59

**V.  <u>CONCLUSION</u>**................................................................................................... 62

iv

## TABLE OF AUTHORITIES

### Cases

Adams v. Inter-Con Security Sys., Inc., 242 F.R.D. 530 (N.D. Cal. 2007).................................. 41

Alix v. Wal-Mart Stores, Inc., 838 N.Y.S.2d 885 (Super. Ct. 2007)......................... 37, 57, 59, 60

Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997) ............................................... 57

Anderson v. Mt. Clemens Pottery Company, 328 U.S. 680 (1946) ...................................... 41, 42

Ansari v. New York Univ., 179 F.R.D. 112 (S.D.N.Y. 1998)........................................ 48

Armstrong v. Weichert Realtors, 2006 U.S. Dist. LEXIS 31351 (D.N.J. May 19, 2006)........... 39

Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79, 238 F.R.D. 82 (S.D.N.Y. 2006) ..... 55

Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp., 222 F.3d 52 (2d Cir. 2000)........................ 57

Bano v. Union Carbide Corp., 2005 U.S. Dist. LEXIS 32595 (S.D.N.Y. Aug. 12, 2005)........... 49

Basco v. Wal-Mart Stores, Inc., 2004 U.S. Dist. LEXIS 12441 (E.D. La. July 1, 2004)....... 36, 40

Bernard v. Household Int'l, Inc., 231 F. Supp. 2d 433 (E.D. Va. 2002) ...................................... 41

Canady v. Allstate Ins. Co., 1997 WL 33384270 (W.D. Mo. June 19, 1997)............................. 50

Castle v. Wells Fargo Fin., Inc., 2008 WL 495705 (N.D. Cal. Feb. 20, 2008) ........................... 28

Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco
    Managed Care, L.L.C., 504 F.3d 229 (2d Cir. 2007)................................................. 54

Damassia v. Duane Reade, Inc., 2006 WL 2853971 (S.D.N.Y. Oct. 5, 2006)............................ 41

Davis v. Charoen Pokphand (USA), Inc., 303 F. Supp. 2d 1272 (M.D. Ala. 2004)............... 38, 39

Diaz v. Elec. Boutique of Am., Inc, 2005 U.S. Dist. LEXIS 30382
    (W.D.N.Y. Oct. 17, 2005)................................................................. 26, 38, 40, 41

Douglas v. Victor Capital Group, 21 F. Supp. 2d 379 (S.D.N.Y. 1998) ................................... 53

Drimmer v. WD-40 Co., 2007 WL 2456003 (S.D. Cal. Aug. 24, 2007)..................................... 47

Dudley v. Tex. Waste Sys., 2005 U.S. Dist. LEXIS 9168 (W.D. Tex. May
    16, 2005) ............................................................................................... 41, 42

Dybach v. Fla. Dep't of Corrections, 942 F.2d 1562 (11th Cir. 1991)........................................ 38

England v. New Century Financial Corp., 370 F. Supp. 2d 504 (M.D. La. 2005) ...................... 40

Falcon v. Starbucks Corp., 2008 WL 153313 (S.D. Tex. Jan. 15, 2008) .................................... 37

Flores v. Osaka Health Spa, Inc., 2006 U.S. Dist. LEXIS 11378 (S.D.N.Y.
     Mar. 16, 2006).......................................................................................................... 31, 39

Foster v. Ford Emporium, 2000 WL 1737858 (S.D.N.Y. Apr. 26, 2000) ) ................................. 47

Garcia v. Elite Labor Serv., Ltd., 1996 WL 33500122 (N.D. Ill. July 11, 1996) ........................ 46

Gen. Telephone Co. of Sw. v. Falcon, 457 U.S. 147 (1982) .................................................. 48, 54

Gjurovich v. Emmanuel's Marketplace, Inc., 282 F. Supp. 2d 91 (S.D.N.Y. 2003)..................... 41

Hallissey v. Am. Online, Inc., 2008 WL 465112 (S.D.N.Y. Feb. 19, 2008) ......................... 25, 41

Harper v. Lovett's Buffet, Inc., 185 F.R.D. 358 (M.D. Ala. 1999) ............................................... 36

Harrison v. McDonald's Corp., 411 F. Supp. 2d 862 (S.D. Ohio 2005)....................................... 40

Hoffmann v. Sbarro, Inc., 982 F. Supp. 249 (S.D.N.Y. 1997) ..................................................... 25

Iglesias-Mendoza v. LaBelle Farm, Inc., 239 F.R.D. 363 (S.D.N.Y. 2007).................................. 25

In re Fosamax Prods. Liab. Litig., 248 F.R.D. 389 (S.D.N.Y. 2008) ............................... 54, 55, 56

In re Nassau County Strip Search Cases, 461 F.3d 219 (2d Cir. 2006)........................................ 58

In re Public Offering Securties Litigation, 471 F.3d 24 (2d Cir. 2006) ("IPO") ................... 40, 48

In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124 (2d Cir. 2001) ............................ 58

King v. ITT Cont'l Baking Co., 1986 WL 2628 (N.D. Ill. Feb. 18, 1986) .................................... 46

Kiobel v. Royal Dutch Petroleum Co., 2004 U.S. Dist. LEXIS 28812 (S.D.N.Y.
     Mar. 31, 2004)............................................................................................................. 47, 50

Lawrence v. City of Philadelphia, 2004 U.S. Dist. LEXIS 8445 (E.D. Pa.
     Apr. 28, 2004).............................................................................................................. 40, 42

Lee v. ABC Carpet & Home, 236 F.R.D. 193 (S.D.N.Y. 2006) ................................................... 41

Levinson v. Primedia Inc., 2003 U.S. Dist. LEXIS 20010 (S.D.N.Y. Nov. 6, 2003)................... 38

Lewis v. Nat'l Fin. Services, Inc., 2007 U.S. Dist. LEXIS 62320 (E.D.N.Y. Aug. 23, 2007) ........................................................................................ 53, 54

Lusardi v. Xerox Corp, 118 F.R.D. 351 (D.N.J. 1987) .................................... 43

Makuc v. Am. Honda Motor Co., 835 F.2d 389 (1st Cir. 1987) .................... 53

Marsh v. Butler Cty. Sch. Sys., 242 F. Supp. 1086 (M.D. Ala. 2003) .................................... 40

Mendoza v. Casa De Cambio Delgado, Inc., 2008 U.S. Dist. LEXIS 27519 (S.D.N.Y. Apr. 7, 2008) ........................................................................ 27, 56

Mentor v. Imperial Parking Sys., Inc., 246 F.R.D. 178 (S.D.N.Y. 2007) .................................... 25

Monahan v. County of Chesterfield, 95 F.3d 1263 (4th Cir. 1996) .............................................. 23

Moore v. PaineWebber, Inc., 306 F.3d 1247 (2d Cir. 2002) ........................ 58

Morales v. Plantworks, Inc., 2006 U.S. Dist. LEXIS 4267 (S.D.N.Y. Feb. 1, 2006) ............. 26, 39

Noble v. 93 Univ. Place Corp., 224 F.R.D. 330 (S.D.N.Y. 2004) ................................ 50

Owen v. Regence BlueCross BlueShield of Utah, 388 F. Supp. 2d 1318 (D. Utah 2005) ........... 50

Patton v. Thomson Corp., 364 F. Supp. 2d 263 (E.D.N.Y. 2005) ................................ 41

Prizmic v. Armour, Inc., 2006 U.S. Dist. LEXIS 42627 (E.D.N.Y. June 12, 2006) .................................................................... 26, 30, 38

Ray v. Motel 6 Operating Ltd. P'ship., 1996 U.S. Dist. LEXIS 22565 (D. Minn. March 18, 1996) ................................................................................ 34, 43

Realite v. Ark Rest. Corp., 7 F. Supp. 2d 303 (S.D.N.Y. 1998) .................................. 25

Robinson v. Dolgencorp, Inc., 2006 U.S. Dist. LEXIS 85471 (M.D. Fla. Nov. 13, 2006) .......... 38

Rodgers v. CVS Pharm., Inc., 2006 U.S. Dist. LEXIS 23272 (M.D. Fla. Mar. 22, 2006) ..... 26, 27

Roebuck v. Hudson Valley Farms, Inc., 239 F. Supp. 2d 234 (N.D.N.Y 2002) .......... 41

Seever v. Carrols Corp., 528 F. Supp. 2d 159 (W.D.N.Y. 2007) ........................ 26, 27, 40, 41, 45

Sheffield v. Orius Corp., 211 F.R.D. 411 (D. Or. 2002) ............................................ 41

Simmons v. T-Mobile USA, Inc., 2007 WL 210008 (S.D. Tex. Jan. 24, 2007) ........ 26, 27, 35, 36

vii

Smith v. Sovereign Bancorp, Inc., 2003 U.S. Dist. LEXIS 21010 (E.D. Pa. Nov. 13, 2003) ...... 39

Sperling v. Hoffmann-LaRoche, Inc., 118 F.R.D. 392 (D.N.J. 1988) .......................................... 27

Swain v. Brinegar, 517 F.2d 766 (7th Cir. 1975) ........................................................................ 50

Tracy v. Dean Witter Reynolds, Inc., 185 F.R.D. 303 (D. Colo. 1998) ...................................... 34

Tucker v. Labor Leasing, Inc., 872 F. Supp. 941 (M.D. Fla. 1994) ............................................ 46

U.S. v. Klinghoffer Bros. Realty Corp., 285 F.2d 487 (2d Cir. 1960) ......................................... 23

Wilks v. Pep Boys, 2006 WL 2821700 (M.D. Tenn. Sept. 26, 2006) .......................................... 37

Williams v. Accredited Home Lenders, Inc., 2006 U.S. Dist. LEXIS 50653
    (N.D. Ga. July 25, 2006) .............................................................................................. 29, 40, 42

Wilson v. Toussie, 2008 U.S. Dist. LEXIS 25469 (E.D.N.Y. March 31, 2008) ............. 49, 50, 51

Wombles v. Title Max of Ala., Inc., 2005 U.S. Dist. LEXIS 34733 (M.D. Ala.
    Dec. 7, 2005) ........................................................................................................................ 38

Woods v. New York Life Ins. Co., 686 F.2d 578 (7th Cir. 1982) ................................................ 46

Young v. Cooper Cameron Corp., 229 F.R.D. 50 (S.D.N.Y. 2005) ............................................ 41

 Zapka v. Coca-Cola Co., 2000 WL 1644539 (N.D. Ill. Oct. 27, 2000) ...................................... 50

## Statutes

29 U.S.C. § 216(b) ...................................................................................................................... 26

N.Y. C.P.L.R. § 901(b) ................................................................................................................ 47

N.Y. Lab. Law § 663 ................................................................................................................... 46

## Rules

Fed. R. Civ. P. 23 ................................................................................................................. passim

Fed. R. Civ. P. 23(a) ........................................................................................................ 48, 57, 58

Fed. R. Civ. P. 23(b)(3) ................................................................................................. 48, 49, 58, 60

**Other Authorities**

Manual for Complex Litigation (Fourth) § 21.222 (2004) .......................................................... 49

5 James Wm. Moore, et al., Moore's Federal Practice, § 23.21[3][d] (3d ed. 2008) ................... 49

# I. **INTRODUCTION**[1]

Based solely on conclusory and unsupported allegations regarding her limited work experience in two Sprint retail stores in New York City, which ended over two years ago, Plaintiff asks this Court to conditionally certify a nationwide FLSA collective action and order that notice be sent to thousands of non-exempt hourly retail store employees who (i) worked in any of its over 1,250 company-owned retail stores at any time during the last three years (ii) allegedly worked "off the clock" and (iii) were denied overtime pay in clear violation of Sprint's long-standing policies.[2]  Based on the same conclusory and unsupported allegations, Plaintiff also asks this Court to certify a statewide Rule 23 class for violation of New York Labor Law.

Plaintiff worked for Sprint for 17 months in 2004 and 2005 as a retail store consultant. She sold wireless products and services at two of its over 1250 stores- one in Harlem and the other in the Bronx.  In support of her motions for certification, Plaintiff offers the Court her own testimony regarding her alleged experiences and little else.  Plaintiff filed this case almost 12 months ago and, yet, not one person has stepped forward to join as a plaintiff or offer testimony in support of her claims.  This is particularly telling as she had a court-ordered four month discovery period specifically designed for her to gather evidence that she was similarly situated

---

[1] Plaintiff has named Sprint Nextel Corporation and Sprint/United Management Company as defendants.  Sprint Nextel Corporation ("SNC") is a holding company and does not employ any retail employees.  (Declaration of Ashley R. Hurst ("Hurst Dec.") Ex. 1 (Bailey Dec.) at ¶ 4.) SNC is not a proper defendant to this action and Plaintiff was informed of this at the beginning of the case.  Defendant Sprint/United Management Company was Plaintiff's employer and is the only proper defendant based on her claims.  For simplicity, Sprint/United Management Company is referred to as "Sprint" throughout this response.

[2] In her Amended Complaint, Plaintiff expressly excludes employees in California from her FLSA class definition.  (Amend. Compl. (Docket No. 8) ¶ 3.)  Thus, for succinctness in this response motion, Defendants' references to "nationwide" with respect to Plaintiff's putative FLSA class do not include California.

to her nationwide FLSA class and representative of her state-wide Rule 23 class. She has failed to find any support for either type of certification. To prevent the inappropriate "stirring up of litigation" and the waste of judicial resources, courts require much more than Plaintiff's own speculative and conclusory allegations to certify either an FLSA collective action or a Rule 23 class action.

Plaintiff argues that her burden for obtaining court approval to send notice of her FLSA collective action to thousands of current and former Sprint retail employees is "extremely lenient." Counting on leniency, she offers the Court nothing more than her own allegations and a speculative theory of how Sprint's lawful company policies merged to cause an adverse effect on hourly retail store employees nationwide. Specifically, she speculates that thousands of local store managers and their district managers around the country felt pressure to increase store sales under Sprint's incentive compensation plans and, at the same time, to minimize overtime costs. This alleged pressure, she further speculates, created the same  environment in over 1250 separate retail stores, which in turn caused all store managers to react the same—that is, they all required or allowed retail store employees to work off the clock to increase their sales without paying them overtime.

Plaintiff creates this "theory" out of whole cloth. She does so because she has the burden of providing the Court with factual evidence that she and her putative class members were victims of a common policy to violate the FLSA. But, she repeatedly admits, as she must, that there is no actual Sprint policy in place that violates the FLSA. In fact, all of Sprint's policies mandate that hourly employees be paid for all hours worked, including overtime.

Without an actual policy to support her theory, Plaintiff offers the Court (i) her own allegations based on 17 months working in two New York City retail stores, (ii) Sprint's

2

incentive compensation guides that set the formula for paying commissions to retail store sales employees and (iii) testimony by Sprint witnesses that Sprint has policies that seek to manage overtime expenses.  This offering is wholly insufficient.  First, Plaintiff fails to offer the Court even a single affidavit that supports any of her allegations.  Next, she fails to explain that although Sprint's formula for earning incentive compensation is standard nationwide for various retail sales positions, the actual sales goals for these positions vary store to store on a monthly basis and are set on a local level—district manager by district manager—based upon each store's sales history and store specific factors.  Finally, she misstates both the testimony and policies regarding overtime, which say nothing more than: overtime is an expense like any other, it should be managed, but it must be paid, whether approved or not, and an employee may be disciplined if he abuses the policy (e.g., by not paying employees for overtime worked or working overtime repeatedly without approval).

Plaintiff cannot fill the gaping hole in her case by merely speculating that store managers are under pressure.  She must provide evidence that thousands of local store managers across the nation felt this "pressure" and then—one by one—decided to force or allow their store employees to work without being paid.  She fails to point the Court to any such evidence because there is none.  This failure of proof is even more pronounced for her Rule 23 class claims—here a <u>rigorous</u> analysis of her evidence is required to determine if she has satisfied all the requirements of Rule 23.

After almost a year, <u>no one</u> has come forward to join Plaintiff in her case or even testify in support of her claims. Courts have rightfully grown increasingly skeptical of a lone plaintiff who seeks to represent a nationwide class without any substantive evidence that others want to join her or to testify that they were subjected to similar harm.  The notice stage of an FLSA

3

collective action, and the certification stage of a Rule 23 class action lawsuit, were never intended (and should not be used) as a fishing expedition by Plaintiff to stir up litigation. Plaintiff's motion for conditional certification and notice should be denied.

## II. **PROCEDURAL HISTORY**

Plaintiff filed this lawsuit in August 2007. (Docket No. 1.) On December 12, 2007, the Court granted the parties' request for a stay until February 1, 2008 to accommodate the mediation of a California case involving Sprint and counsel for the Plaintiff. (Docket No. 24.) After expiration of the stay, Judge Fox held a conference with the parties and issued an Order setting forth a three-month discovery period with respect to the issue of whether Plaintiff is similarly situated to, and representative of, other prospective plaintiffs. (2/29/08 Order (Docket No. 26).) In this Order, the Court also established a briefing schedule for Plaintiff to file her motions for conditional certification under the FLSA and Rule 23 class certification of her New York law claims. (Id.) Discovery proceeded, and on May 19, 2008, Plaintiff requested a thirty-day extension of the discovery period and the briefing schedule. Defendants did not oppose this extension and the Court granted it. (Docket No. 32.) The extended discovery period ended on June 20, 2008 with both certification motions due on July 11, 2008.

On July 11, 2008, Plaintiff timely filed the instant motions for certification of a nationwide FLSA collective action and a statewide Rule 23 class action. (Docket No. 36.) This response brief responds to both motions.

In many ways the posture of this case has not changed since it was filed. Nearly a year after the lawsuit was filed, and after the close of a four-month discovery period, Plaintiff is still the lone plaintiff. No one else has consented to join in this lawsuit. Nor has Plaintiff submitted a single declaration, or other testimony, from any other Sprint employee attesting that the

employee was subjected to conduct similar to the conduct that Plaintiff complains of, in support of Plaintiff's motions.  Like the day she filed her complaint, Plaintiff is still relying solely on her own allegations to support her claims.

### III.  STATEMENT OF FACTS

**A.    Plaintiff Melissa Eng-Hatcher Worked for 17 Months as a Sprint Retail Store Consultant.**

Little was actually said about Plaintiff in her certification papers.  But understanding the facts surrounding her employment with Sprint are critical to deciding her certification motions.

Plaintiff Melissa Eng-Hatcher worked for a total of 17 months in two New York City Sprint stores.  She was hired on July 19, 2004, as a Retail Store Consultant ("RSC"), in Sprint's Store 160.[3]  (Hurst Dec. Ex. 2 (Eng-Hatcher's offer letter); see also Hurst Dec. Ex. 3 (Eng-Hatcher Dep.) at 36-37.)  RSCs are non-exempt hourly employees and, as such, are eligible for overtime pay.  (Hurst Dec. Ex. 1 (Bailey Dec.) at ¶ 17.)  They act as one of the primary sales contacts for retail customers in a Sprint store.  (See Hurst Dec. Ex. 3 (Eng-Hatcher Dep.) at 37-38; Hurst Dec. Ex. 4 (Dixon Dep.) at 40-41; Hurst Dec. Ex. 5 (Galluccio Dep.) at 63-64.)  As needed, RSCs may also perform non-sales tasks, including attending staff meetings, and cleaning the store.  (Hurst Dec. Ex. 4 (Dixon Dep.) at 40-41; Hurst Dec. Ex. 5 (Galluccio Dep.) at 46-47, 63-64.)  Eng-Hatcher was an RSC throughout her entire time with Sprint.  (See Hurst Dec. Ex. 2 (Eng-Hatcher's offer letter); Hurst Dec. Ex. 1 (Bailey Dec.) ¶ 32.)

---

[3] At Store 160, the store manager was Julien Ancion; her assistant store managers were Rudy Francis, Hassan Clark, and Bart Frazier; and the senior retail store consultants were Latasha Martin and Maribel Ortiz.  (Hurst Dec. Ex. 1 (Bailey Dec.) at ¶ 30; Hurst Dec. Ex. 3 (Eng-Hatcher Dep.) at 46-47.)

Eng-Hatcher worked at Store 160 for four months, until she transferred in November 2004 to Sprint's new Store 1185 in the Bronx, which was just opening.[4]  (Hurst Dec. Ex. 3 (Eng-Hatcher Dep.) at 64, Ex. 9.)  She continued to work at Store 1185 until she took maternity leave on December 2, 2005.  (Id. at 165.)  Her leave lasted until March 2006, when she returned to work for two days.  (See id. at 168.)  After that, she stopped reporting to work.  (Id. at 168-69.)

**B.      Sprint and the Decentralized Management Structure of Its Retail Stores.**

Sprint is part of the global communications giant "Sprint Nextel" that sells a wide range of communications products and services.  Currently, there are approximately 1,250 company-owned retail stores nationwide.  (Hurst Dec. Ex. 4 (Dixon Dep.) at 18.)  These stores are a diverse group.  They are located in forty-three states and the District of Columbia.  (Hurst Dec. Ex. 1 (Bailey Dec.) ¶ 5.)  There are Sprint stores in urban and suburban settings; in large, mid-sized, and small cities; and in strip-malls, shopping malls and stand-alone locations.  (Id.)  Because of this diversity, sales volume and staffing vary significantly, based on store size, location, and other factors.  (Id. at ¶ 7.)

Given this diversity, Sprint leaves the day-to-day management of its stores to the discretion of local and regional managers.  (Id. at ¶ 8.)  Every Sprint store has a Store Manager ("SM").  (Id. at ¶ 9.)  The SMs report to District Managers ("DM"), each of whom is responsible for a number of retail stores.  (Id.; Hurst Dec. Ex. 5 (Galluccio Dep.) at 89.)  DMs, in turn, report to Area Retail Directors who report to Area Vice Presidents, and Area Vice Presidents report to

---

[4] At Store 1185, the store manager was Victor Paradis; the ASMs were Sonia Lugo and George Zeotis; and the senior retail store consultants were Shaheed Ranga, Johnny Santana, and Dina Assad.  (Hurst Dec. Ex. 1 (Bailey Dec.) at ¶ 31; Hurst Dec. Ex. 3 (Eng-Hatcher Dep.) at 117-18.)

the Senior Vice President of Retail.[5]  (Hurst Dec. Ex. 1 (Bailey Dec.) at ¶¶ 12-13.)  Only Store

Managers and Assistant Store Managers work in the retail stores, and, together, they run the

stores and supervise store employees.

1.    **The Employees in Sprint's Retail Stores:  Store Managers, Assistant Store Managers, Senior Retail Store Consultants, Retail Store Consultants, Technical Service Representatives, and Store Hosts**

Each Store Manager, who is responsible for the day-to-day operation of the store,

administers and enforces Sprint's wage-and-hour policies.  (Hurst Dec. Ex. 1 (Bailey Dec.) at ¶

9; Hurst Dec. Ex. 10 (Revised Wyatt Dec.) at ¶ 6.)  SMs are eligible to receive commissions

under Sprint's incentive compensation plan.  (See Wells Dec. Ex. J at 18-45.)  An SM's

commission payment is based on both the SM's individual sales and the performance of the

store.  (See id. at 19.)

Some Sprint retail stores have an Assistant Store Manager ("ASM"), who assists the SM

in managing the store and supervising employees.  (See Hurst Dec. Ex. 6 (ASM job

description).)  The ASM is a non-exempt position that, in most states, is paid a salary plus

overtime.  (Id.)  Like SMs, an ASM is eligible for commissions, and the amount of the

commission is based on both the performance of the retail store and the ASM's individual sales.

(See Wells Dec. Ex. J at 47.)

Retail stores may also have some or all of the following non-exempt hourly positions:

Senior Retail Store Consultant ("SRSC") (also known as a "Lead"), RSC (Eng-Hatcher's former

position), Technical Service Representative ("TSR"), and Host (also known as a "Greeter").

---

[5] This corporate structure has changed over time as Sprint has gone through a number of
corporate reorganizations.  (Hurst Dec. Ex. 4 (Dixon Dep.) at 19-21.)

(Hurst Dec. Ex. 1 (Bailey Dec. ¶ 16.)[6] The primary job responsibility for SRSCs, along with the RSCs, is to make sales to retail customers in a Sprint store. (See Hurst Dec. Ex. 3 (Eng-Hatcher Dep.) at 37-38; Hurst Dec. Ex. 4 (Dixon Dep.) at 40-41; Hurst Dec. Ex. 5 (Galluccio Dep.) at 63-64.) SRSCs also assist SMs and ASMs with some management functions.[7] (See Hurst Dec. Ex. 3 (Eng-Hatcher Dep.) at 214 (describing SRSCs as sometimes "doing payroll"); id. at 93 (testifying that she was trained by her SRSCs).)

SRSCs and RSCs are eligible to receive commissions based on their individual sales. (Wells Dec. Ex. J at 74-87.) Unlike Store Managers and Assistant Store Managers, SRSCs' and RSCs' commissions are not dependant on the overall performance of the store; their commissions depend only on their individual performance, including both sales volume and customer satisfaction. (See id. at 76 (SRSC); id. at 82-83 (RSC); see also Hurst Dec. Ex. 7 (2005 Sales Incentive Plans) at 31, 38.)

Finally, some retail stores have Technical Service Representatives and Hosts. A TSR's responsibilities relate to technical issues that may arise with a customer's service or equipment. (Hurst Dec. Ex. 1 (Bailey Dec.) at ¶ 20.) TSRs are not currently eligible to receive incentive compensation. (Id.) They were eligible to receive incentive compensation through 2004, but their incentive compensation was based on the store's overall sales performance as they did not have an individual sales goal. (See Hurst Dec. Ex. 8 (2004 Master Incentive Compensation

---

[6] Plaintiff refers to her class of hourly retail store employees as "Retail Consultants." This is not a Sprint term, but was made up by Plaintiff. Plaintiff appears to include any employee in a retail store below the store manager-level in her definition of Retail Consultants. This grouping of dissimilar positions is inappropriate and is discussed in more detail infra Section IV(A)(3)(a).

[7] Before Sprint created the Assistant Store Manager position, SRSCs performed many of the responsibilities of assistant store managers (and some stores still do today). (Hurst Dec. Ex. 1 (Bailey Dec.) ¶ 11.)

Guide) at 15.)  Hosts are responsible for greeting customers when they enter the stores.  (Hurst

Dec. Ex. 9 (Host job description).)  During the majority of Plaintiff's proposed class period,

Hosts were ineligible to participate in Sprint's incentive-compensation plan.  In mid-2007, Hosts

became eligible to earn commissions based on store performance and sales.  (See Wells Dec. Ex.

J. at 89.)

**2.      Store Managers and District Managers are not Rewarded or Penalized for the Amount of Overtime Expenses Incurred in Their Stores.**

Store Managers and District Managers are <u>not</u> rewarded or penalized for the amount of

overtime expenses incurred in their stores—in other words, there is neither a "carrot" nor a

"stick" associated with overtime expenses.  (Pl. FLSA Br. at 3.)  SMs and DMs earn

commissions based on store performance, including sales volume and customer retention.

(Wells Dec. Ex. J at 11; <u>see</u> Hurst Dec. Ex. 7 at 4 (2005 Sales Incentive Plans).)  Overtime

expenses do not impact the commissions that SMs and DMs earn.  (Hurst Dec. Ex. 1 (Bailey

Dec.) ¶ 21; <u>see generally</u> Wells Dec. Ex. J at 11-17 (commission plan for District Managers), 18-

45 (commission plan for SMs).)  Thus, there is no reward or incentive (compensation-based or

otherwise) for SMs or DMs to reduce their stores' overtime expenses.  (Hurst Dec. Ex. 5

(Galluccio Dep.) at 80.)

SMs and DMs are also not penalized for the amount of overtime expenses incurred by

their stores.  At the store level, Sprint budgets labor costs based on headcount, not labor hours.

(Hurst Dec. Ex. 5 (Galluccio Dep.) at 72-73; Hurst Dec. Ex. 4 (Dixon Dep.) at 43-45.)  This

means that Sprint budgets its labor costs based on the number of full-time and part-time

employees needed in a particular store, not on the number of hours that Sprint wants its

employees to work.

A Store Manager typically receives a headcount number from the District Manager, and the SM staffs the store based on that number.  (Hurst Dec. Ex. 10 (Wyatt Dec.) ¶ 14; Hurst Dec. Ex. 11 (Ancion Dec.) ¶ 17.)  SMs do not receive a budget for overtime or other labor expenses, nor do the headcount numbers reflect the number of overtime hours retail employees are permitted to work.  (Hurst Dec. Ex. 10 (Wyatt Dec.) at ¶ 14; Hurst Dec. Ex. 11 (Ancion Dec.) at ¶ 17; see also Hurst Dec. Ex. 5 (Galluccio Dep.) at 72-73.)  Given that Sprint's labor budgets are not based at all on overtime hours, neither SMs nor DMs are subject to discipline for incurring overtime hours.  (Hurst Dec. Ex. 1 (Bailey Dec.) ¶ 22; see also Hurst Dec. Ex. 5 (Galluccio Dep.) at 75 (testifying that corrective action "could" be taken for exceeding headcount (i.e., overstaffing).)

**C.    Sprint's Policies Prohibit Working Off the Clock and Mandate that All Overtime—Even Overtime that was not Pre-Approved—Be Paid.**

At all times relevant to this lawsuit, Sprint's policies clearly and unequivocally (1) prohibited its employees from working "off the clock"; and (2) mandated that all overtime hours worked must be paid.  Sprint's Employee Guide, for example, advises employees that they "cannot perform 'off-the-clock' . . . work without pay."  (See Hurst Dec. Ex. 12 (2007 Employee Guide) at 15.)[8]  Sprint's overtime policy is just as clear:

---

[8] (See also Hurst Dec. Ex. 14 (2006 Work Schedules policy) at 1) ("Hourly paid employees will never work 'off the clock'!"); Hurst Dec. Ex. 15 (Sept. 2006 Employee Handbook) at 12) ("Employee is required to clock-in and clock-out through the stores [sic] POS system for any and all time worked."); Hurst Dec. Ex. 16 (March 2005 Employee Handbook) at 11) (it is an employee's "responsibility to report the hours [they] work").)

Working during meal breaks is likewise prohibited:  "**Employees will take their scheduled lunch breaks**, clocking out at the beginning of the lunch break and clocking in when returning to their workstation."  (See Hurst Dec. Ex. 14 (2006 Work Schedules policy) at 1-2 (emphasis in original); see also, e.g., Wells Dec. Ex. E; Hurst Dec. Ex. 5 (Galluccio Dep.) at 50-51 (stating that retail employees are not permitted to make sales during their lunch break); Hurst Dec. Ex. 10 (Wyatt Dec.) at ¶ 19 ("My employees take at least a thirty (30) minute meal break during a full

> In accordance with the Fair Labor Standards Act, non-exempt employees will be paid one and one-half (1 1/2) times their basic hourly rate for any hours worked in excess of 40 hours per workweek. . . . **Overtime must be paid for all hours worked, regardless of whether the hours are approved by management.**

(Hurst Dec. Ex. 13 (2004 Pay Practices Guidelines) at 5) (emphasis added).)[9]  Sprint trains its employees extensively on these policies.  (See, e.g., Wells Dec. Ex. K) (no off-the-clock poster); Hurst Dec. Ex. 10 (Wyatt Dec.) at ¶ 7 ("All my employees are trained regarding Sprint Nextel's policies and procedures, including wage and hour policies.").)[10]

These policies work only if Sprint has accurate records of its employees' time, and retail store employees have a duty to record their time.  (See, e.g., Hurst Dec. Ex. 16 (2005 Employee Handbook) at 11 ("It is your responsibility to report the hours you work . . . .").)[11]  Since

---

shift.  My employees clock out before taking meal breaks and clock back in immediately before going back to work after a meal break.").)

[9] (See also, e.g., Hurst Dec. Ex. 17 (2005 Overtime policy) at 49); Hurst Dec. Ex. 18 (2006 Pay Practices) at 3-4); Hurst Dec. Ex. 19 (2007 Pay Practices) at 3); Hurst Dec. Ex. 20 (Jan. 29, 2004 e-mail from Brian Bromberg to Adrien Veltri et al.) ("If an employee works OT, WE MUST PAY THEM!"); Hurst Dec. Ex. 21 (Jan. 26, 2004 e-mail) ("[I]t is important to remember that if an employee works overtime without prior approval, we are absolutely required by law to pay them for it."); Wells Dec. Ex. E; Hurst Dec. Ex. 4 (Dixon Dep.) at 46.)

[10] (See also Hurst Dec. Ex. 22 (training poster); Hurst Dec. Ex. 23 (March 2005 FLSA Compliance guide); Hurst Dec. Ex. 24 (2005 FLSA and wage-and-hour training); Hurst Dec. Ex. 25 (2006 overtime and pay training); Hurst Dec. Ex. 26 (2006 FLSA and pay-practices training); Hurst Dec. Ex. 27 (2005 FLSA training); Hurst Dec. Ex. 28 (Castillo Dec.) at ¶ 6; Hurst Dec. Ex. 29 (Diaz Dec.) at ¶ 7; Hurst Dec. Ex. 30 (Assad Dec.) at ¶ 9; Hurst Dec. Ex. 31 (Brown Dec.) at ¶¶ 7-8; Hurst Dec. Ex. 32 (Bedford Dec.) at ¶ 7; Hurst Dec. Ex. 10 (Wyatt Dec.) at ¶ 7.)

[11] (See also, e.g., Hurst Dec. Ex. 28 (Castillo Dec.) at ¶ 10 ("My store managers have always told me to accurately record all the time that I work.  My store managers are clear that my co-workers and I must record all of the time that we work, including overtime."); id. ¶ 7; Hurst Dec. Ex. 10 (Wyatt Dec.) at ¶ 7 ("employees are taught that they must clock in and out when:  (1) beginning a shift; (2) beginning a meal break; (3) returning from a meal break; and (4) upon completion of

approximately June 2006, all retail employees nationally record their time through Sprint's
Retail Time & Attendance system ("RTA"). (Hurst Dec. Ex. 33 (Lynch Dep.) at 40-41.)[12]
Employees clock in and out through Sprint's point-of-sale system. (Hurst Dec. Ex. 34 (June
2006 RTA Store Manager Guide) at 4.) Since Sprint implemented RTA, employees are unable
to process any sales without first clocking-in. (See Hurst Dec. Ex. 31 (Brown Dec.) at ¶ 9 ("If I
want to make a sale I must be on the clock or logged in to use the computer system."); Hurst
Dec. Ex. 28 (Castillo Dec.) at ¶ 8; Hurst Dec. Ex. 33 (Lynch Dep.) at 51.)[13]

 Prior to implementation of RTA nationwide in 2006, Sprint retail store employees
recorded their time using a myriad of devices, i.e., paper timesheets, time clocks, swipe cards,
etc. (Hurst Dec. Ex. 33 (Lynch Dep.) at 43, 58-59.) Regardless of the method used by a
particular store, Sprint's policy that employees are paid for all time worked, including overtime,
remained the same.[14]

 Sprint recognizes that no timekeeping system is full-proof. Thus, Sprint has implemented
multiple checks to prevent, detect, and correct timekeeping mistakes. On a national basis, Sprint
audits its stores' compliance with timekeeping policies. (Hurst Dec. Ex. 35 (Bair Dep.) at 40-41,
52-53.) At each individual store, managers are required to review and correct employee time

---

a shift"); Hurst Dec. Ex. 30 (Assad Dec.) at ¶ 8; Hurst Dec. Ex. 31 (Brown Dec.) at ¶ 8; Hurst
Dec. Ex. 28 (Castillo Dec.) at ¶ 7; Hurst Dec. Ex. 29 (Diaz Dec.) at ¶ 7.)

[12] (See also Hurst Dec. Ex. 10 (Wyatt Dec.) at ¶ 16; Hurst Dec. Ex. 32 (Bedford Dec.) at ¶ 12;
Hurst Dec. Ex. 34 (June 2006 RTA Launch Guide) at 4.)

[13] This system function that requires employees to be on the clock before making sales may have
been used in some stores prior to 2006. (Hurst Dec. Ex. 33 (Lynch Dep.) at 52.)

[14] Plaintiff repeatedly states that retail store employees are only paid for hours that are
"recorded." (e.g., Pl. FLSA Br. at 1, 5.) Yet, as Sprint's policies expressly state, Sprint pays for
all hours worked.

records on at least a weekly basis, and employees are required to verify and sign their records. (Hurst Dec. Ex. 5 (Galluccio Dep.) at 96-97; Hurst Dec. Ex. 3 (Eng-Hatcher Dep.) at 81; Hurst Dec. Ex. 33 (Lynch Dep.) at 48-49; Hurst Dec. Ex. 4 (Dixon Dep.) at 32-33; Hurst Dec. Ex. 36 (Bailey Dep.) at 53, 54; Hurst Dec. Ex. 37 (2006 Managers' Guide to RTA) at 4.)[15]

If an employee discovers that her time records are incorrect, the employee can ask her manager to correct the record. (Hurst Dec. Ex. 3 (Eng-Hatcher Dep.) at 100-01; Hurst Dec. Ex. 4 (Dixon Dep.) at 34-35; Hurst Dec. Ex. 10 (Wyatt Dec.) at ¶ 18.)[16] In addition, Sprint has two helplines that employees can call to address any employment-related issues, including questions regarding timekeeping and payroll or to report unethical behavior. (Hurst Dec. Ex. 33 (Lynch Dep.) at 72, 80-81; Hurst Dec. Ex. 4 (Dixon Dep.) at 34-35.)[17] The first is the Employee Helpline, which "offers information and assistance to employees on many topics, including benefits, security, payroll and ethics." (Hurst Dec. Ex. 12 (Jan. 2007 Employee Guide) at 5.) Sprint employees can also call the Ethics Helpline with "any ethics-related issues." (Hurst Dec. Ex. 15 (Sept. 2006 Employee Handbook) at 29.)

---

[15] (See also Hurst Dec. Ex. 10 (Wyatt Dec.) at ¶ 16; Hurst Dec. Ex. 32 (Bedford Dec.) at ¶¶ 12, 13; Hurst Dec. Ex. 31 (Brown Dec.) at ¶ 20; Hurst Dec. Ex. 29 (Diaz Dec.) at ¶ 20.)

[16] (See also Hurst Dec. Ex. 30 (Assad Dec.) at ¶ 10; Hurst Dec. Ex. 32 (Bedford Dec.) at ¶ 10; Hurst Dec. Ex. 31 (Brown Dec.) at ¶ 20; Hurst Dec. Ex. 29 (Diaz Dec.) at ¶ 20.)

[17] (See also Hurst Dec. Ex. 30 (Assad Dec.) at ¶ 10; Hurst Dec. Ex. 31 (Brown Dec.) at ¶¶ 15, 20; Hurst Dec. Ex. 28 (Castillo Dec.) at ¶ 14.) As with its other wage-and-hour practices, Sprint trains its employees on these mechanisms for detecting and correcting timekeeping mistakes. See, e.g., Hurst Dec. Ex. 10 (Wyatt Dec.) at ¶ 9 ("[E]mployees are taught that if they have any complaints or concerns about any issue, including being properly paid for time worked, they can address them with me or the other management employees, or they may contact Sprint Nextel's Ethics Hotline . . . ."); Hurst Dec. Ex. 32 (Bedford Dec.) at ¶ 10; Hurst Dec. Ex. 38 (Galarza Dec.) at ¶¶ 15, 20; Hurst Dec. Ex. 39 (Gelin Dec.) at ¶¶ 14, 19; see also Hurst Dec. Ex. 3 (Eng-Hatcher Dep.) at 212 (explaining how she would have her time records corrected).)

**D.    Eng-Hatcher's and Her Co-workers' Experiences in Stores 160 and 1185 Differed Greatly.**

The two stores at which Eng-Hatcher worked had significant differences.  Store 160 was one of Sprint's "Tier A" stores, meaning that it was among Sprint's highest-selling stores nationwide.  (See Hurst Dec. Ex. 40 (Dowling Dep.) at 58-59; Hurst Dec. Ex. 1 (Bailey Dec.) at ¶¶ 23, 27.)  Store 1185, by contrast, was a "Tier B" store, meaning its sales volume was expected to be lower than Sprint's Tier A stores.  (See Hurst Dec. Ex. 40 (Dowling Dep.) at 58-59; Hurst Dec. Ex. 1 (Bailey Dec.) at ¶¶ 23, 28.)  Tier B Store Managers and Assistant Store Managers have lower sales incentive targets and are expected to have lower sales volume than Tier A stores.  (Hurst Dec. Ex. 1 (Bailey Dec.) at ¶ 25.)  The sales and marketing strategies developed or pursued by each store vary based on Tier, location, size, and other factors.  (Id.)  Eng-Hatcher herself noted this fact in her deposition, when she testified that sales were lower in Store 1185 (a Tier B store) than in Store 160 (a Tier A store), and that she had to perform outbound sales activities at Store 1185, but not at Store 160.  (Hurst Dec. Ex. 3 (Eng-Hatcher Dep.) at 163, 105, 124-125.)

Indeed, Eng-Hatcher's testimony shows that her work experience in the two stores differed in a variety of ways, including the type of and reason for her alleged off-the-clock overtime work.  Specifically, Eng-Hatcher testified that she was "sometimes"[18] not paid for all of her hours performing the following types of work:

- Waiting while cash was counted in the 160 store at the end of the day (Hurst Dec. Ex. 3 (Eng-Hatcher Dep.) at 84-86);

- Making sales to customers during her lunch break (id. at 106-08, 110-11, 220-21, 235-36);

_____

[18] (See, e.g., Hurst Dec. Ex. 3 (Eng-Hatcher Dep.) at 78, 99, 190.)

- Working off-the-clock to make sales before or after shift in the 1185 store (id. at 190, 207-08)

- Doing outbound sales activities on her days off for her first three months in the 1185 store (id. at 127);

- Coming into the 1185 store on her days off to make sales for customers (id. at 198-99); and

- Handing out flyers on her lunch break at the 1185 store (id. at 105, 122).

These activities are the only allegedly illegal practices that Eng-Hatcher claims to have experienced at stores 160 or 1185, and she has produced nothing other than her own deposition testimony to support them. In stark contrast, Sprint, however, has produced the declarations from 15 retail employees in stores 160 and 1185 that all contradict Eng-Hatcher's allegations. (Hurst Dec. Exs. 10, 28-32, 38-39, 42-48; supra Section III(F).)

E.    **Eng-Hatcher and Other Retail Store Consultants Earned a Significant Amount of Overtime Pay.**

Plaintiff does not allege that she was never paid overtime. Instead, she claims that sometimes she was paid overtime and sometimes she was not. She admits that Sprint paid her for overtime hours at both stores 160 and 1185. (Hurst Dec. Ex. 3 (Eng-Hatcher Dep.) at 65, 192.) At Store 160, Eng-Hatcher earned pay for nine pay periods, and Sprint paid her overtime in six of those periods. (Hurst Dec. Ex. 41 (Ratliff Dec.) at ¶ 9.) In total, Eng-Hatcher was paid for 34.35 overtime hours at Store 160, or an average of 5.73 overtime hours in each pay period that she earned overtime. (Id.) Her highest single pay-period overtime total at Store 160 was 12.1 hours. (Id.) At Store 1185, Eng-Hatcher earned regular pay during thirty pay periods between November 2004 and December 2005. (Id.) Sprint paid her for overtime hours in nine

of those thirty periods, for a total of 19.55 overtime hours or an average of 2.17.  (<u>Id</u>.)  Her

highest single-pay-period overtime total at Store 1185 was 5 hours.  (<u>Id</u>.)[19]

Eng-Hatcher's overtime numbers are among the lowest of all RSCs at both stores 160 and

1185.  In 2004, for example, 15 of Store 160's RSCs averaged more overtime hours per pay

period than Eng-Hatcher, with the averages ranging from 14.36 hours per period down to Eng-

Hatcher's 5.73.  (<u>See</u> Hurst Dec. Ex. 41 (Ratliff Dec.) at Ex. A.)  The same is true for Store 1185

in 2005, where another 17 RSCs averaged more overtime hours than Eng-Hatcher, with the

averages there ranging from 19.08 hours per period down to Eng-Hatcher's 2.17.  (<u>Id</u>.)  These

numbers are telling, as they are from employees who worked in the <u>same store</u>, under the <u>same</u>

<u>managers</u>, and in the <u>same working conditions</u> as Eng-Hatcher.[20]  (<u>Id</u>.)

Sprint also paid the Retail Store Consultants in its other stores in New York and around

the country for a significant amount of overtime.  From 2004 to 2007, RSCs worked over 2.8

million overtime hours nationwide.  (Hurst Dec. Ex. 41 (Ratliff Dec.) ¶ 6.)  This amounted to

over $44.5 million in overtime payments.  (<u>Id</u>.)  In New York alone, RSCs earned over $2.6

million for almost 150,000 overtime hours.  (<u>Id</u>. at ¶ 5.)  In fact, over the last four years, the

---

[19] It is not surprising that Eng-Hatcher was paid for fewer overtime hours at Store 1185 than at Store 160.  Store 1185 was expected to have lower sales volume than Store 160.  (Hurst Dec. Ex. 1 (Bailey Dec.) at ¶¶ 23, 28; <u>see also</u> <u>supra</u> Section III(D) (discussing the differences between stores 160 and 1185).)

[20] Indeed, even the particular RSCs mentioned in Plaintiff's FLSA motion as purportedly not having been paid for all hours worked earned significantly more overtime than Eng-Hatcher.  (Pl. FLSA Br. at 21.)  In 2005, when Eng-Hatcher earned 14.55 hours of overtime, Sprint paid Jermaine Gardner for 118.25 overtime hours, Johnny Santana for 103.5 overtime hours, Robert Torres for 43.75 overtime hours, and Helen Rosario for 16.3 overtime hours.  Likewise, in 2004 Sprint paid Cecil Desouza (who worked with Eng-Hatcher in Store 160) for 59.75 overtime hours, compared to Eng-Hatcher's Store 160 total of 34.35 hours.  (Hurst Dec. Ex. 41 (Ratliff Dec.) at Ex. A.)

average number of overtime hours paid on a per-RSC basis both nationally and in New York

<u>increased</u>:

| Year | Average OT Hours Per RSC (National) | Average OT Hours Per RSC (New York) |
|---|---|---|
| 2004 | 46 | 40 |
| 2005 | 50 | 44 |
| 2006 | 60 | 53 |
| 2007 | 70 | 55 |

(<u>Id</u>. at ¶ 7.)  These numbers reflect Sprint's policy:  To pay its employees for all overtime hours

worked.  (<u>See</u> Hurst Dec. Ex. 13 (2004 Pay Practices Guidelines) at 5.)

**F.    The Evidence From Other Store 160 and 1185 Retail Employees Contradicts Eng-Hatcher's Allegations.**

All of the evidence in this case from Sprint's retail employees disputes Eng-Hatcher's

allegations.  For example, Sprint has produced the declarations of 12 retail employees from

stores 160 or 1185 who all state that Sprint has <u>never</u> refused to pay for any of their overtime

hours.  (<u>See, e.g.</u>, Hurst Dec. Ex. 30 (Assad Dec.) at ¶ 16 ("I have never refused to pay an

employee for overtime worked . . . . I also have never been denied payment for overtime I

worked . . . ."); Hurst Dec. Ex. 29 (Diaz Dec.) at ¶ 12 ("My store managers have always

approved all overtime that I have worked, and I have always been paid for this overtime.").[21]

---

[21] (<u>See also</u> Hurst Dec. Ex. 32 (Bedford Dec.) at ¶ 5; Hurst Dec. Ex. 28 (Castillo Dec.) at ¶¶ 12, 13; Hurst Dec. Ex. 42 (Estevez Dec.) at ¶¶ 14, 15; Hurst Dec. Ex. 38 (Galarza Dec.) at ¶¶ 12, 13; Hurst Dec. Ex. 39 (Gelin Dec.) at ¶¶ 12, 13; Hurst Dec. Ex. 43 (Gonzalez Dec.) at ¶¶ 12, 13; Hurst Dec. Ex. 44 (Grimotes Dec.) at ¶¶ 12, 13; Hurst Dec. Ex. 45 (Guzman Dec.) at ¶ 12; Hurst Dec. Ex. 46 (Lavandier Dec.) at ¶¶ 12, 13; Hurst Dec. Ex. 10 (Wyatt Dec.) at ¶ 17.)

The same is true for off-the-clock work:  Sprint has produced 15 declarations that all state

that the employee has always been paid for all hours worked.  (See, e.g., Hurst Dec. Ex. 10

(Wyatt Dec.) at ¶ 11 ("I have never asked an employee to work 'off the clock.'  I have never

encouraged or pressured an employee to work 'off the clock,' regardless of whether sales

numbers were low or how busy we were.").)[22]

There is similar uniformity among the other employees regarding being paid for working

on outbound sales promotions.  (See, e.g., Hurst Dec. Ex. 10 (Wyatt Dec.) at ¶ 28 ("If one of my

employees works outside the store for a Sprint Nextel promotion, . . . the employee is paid for all

hours worked, including any travel time to the event and any overtime.").[23]

Eng-Hatcher has not produced any evidence—other than her own statements—that

contradicts these declarations.  There is thus no evidence that she was the victim of some illegal

national—or even state-wide, district-wide, or store-wide—policy.

**G.     Eng-Hatcher's Brief Mischaracterizes Much of the Evidence in this Case.**

In addition to Plaintiff's failure to provide evidence of an unlawful policy, Plaintiff

misconstrues the evidence in this case.  Even a cursory review of the record cites in Eng-

---

[22] (See also Hurst Dec. Ex. 30 (Assad Dec.) at ¶¶ 5, 9; Hurst Dec. Ex. 32 (Bedford Dec.) at ¶ 4;
Hurst Dec. Ex. 31 (Brown Dec.) at ¶ 6; Hurst Dec. Ex. 28 (Castillo Dec.) at ¶ 5; Hurst Dec.
Ex. 29 (Diaz Dec.) at ¶¶ 6, 7; Hurst Dec. Ex. 47 (Geronimo Dec.) at ¶¶ 5, 7; Hurst Dec. Ex. 42
(Estevez Dec.) at ¶¶ 6, 8; Hurst Dec. Ex. 38 (Galarza Dec.) at ¶¶ 5, 6; Hurst Dec. Ex. 39 (Gelin
Dec.) at ¶¶ 6, 8; Hurst Dec. Ex. 43 (Gonzalez Dec.) at ¶¶ 5-7; Hurst Dec. Ex. 44 (Grimotes Dec.)
at ¶¶ 5-7; Hurst Dec. Ex. 45 (Guzman Dec.) at ¶¶ 5-7; Hurst Dec. Ex. 46 (Lavandier Dec.) at ¶¶
5-7; Hurst Dec. Ex. 48 (Valdez Dec.) at ¶¶ 5, 6.)

[23] (See also Hurst Dec. Ex. 30 (Assad Dec.) at ¶¶ 23, 24; Hurst Dec. Ex. 32 (Bedford Dec.) at ¶
23; Hurst Dec. Ex. 29 (Diaz Dec.) at ¶ 14; Hurst Dec. Ex. 42 (Estevez Dec.) at ¶ 16; Hurst Dec.
Ex. 38 (Galarza Dec.) at ¶ 14; Hurst Dec. Ex. 45 (Guzman Dec.) at ¶ 14; Hurst Dec. Ex. 46
(Lavandier Dec.) at ¶ 14.)

Hatcher's brief shows that many of them fail to support the proposition for which they are cited. A few of the more egregious examples are shown below.

**Mischaracterization**:  "Sprint's nationwide policy is to keep overtime costs to as close to zero as possible."  (Pl. FLSA Br. at 7.)

**Actual Evidence**:  Mr. Bailey did not testify that Sprint has a nationwide policy of keeping overtime "as close to zero as possible."  Rather, he said that while "[w]e hope to keep it at minimal levels," "we realize there is always going to be needs [sic] for overtime in our business." (Hurst Dec. Ex. 36 (Bailey Dep.) at 35.)  The "hope" that Mr. Bailey referenced is simply a rational business judgment that, to the extent possible, expenses should be controlled. Overtime is one such expense and, depending on the circumstances, Sprint "at times" manages it "more closely and more sharply" than at other times.  (Id. (emphasis added).)  Managing an expense "at times" is very different than having a consistent nationwide policy of keeping that expense "close to zero."  As Mark Galluccio testified in his deposition:  "It's very clear that [Sprint] can't limit overtime, so you have to put in place controls that allow for overtime, but control overtime."  (Hurst Dec. Ex. 5 (Galluccio Dep.) at 93-94; see also Hurst Dec. Ex. 4 (Dixon Dep.) at 46-47.)

**Mischaracterization**:  "Sprint has a national policy of setting quotas for Retail Consultants . . . Sprint's corporate headquarters, working in conjunction with management personnel, sets sales quotas for Retail Consultants."  (Pl. FLSA Br. at 7.)

**Actual Evidence**:  Sprint does not set sales quotas for RSCs at the national corporate level.  Rather, specific sales goals are set at the local and regional level, by District Managers. (See Hurst Dec. Ex. 10 (Wyatt Dec.) at ¶ 13; Hurst Dec. Ex. 5 (Galluccio Dep.) at 54.)  Sprint's national headquarters simply establishes the formulas for calculating whether an RSC has earned

a commission.  (Hurst Dec. Ex. 10 (Wyatt Dec.) at ¶ 13; <u>see also</u> Wells Dec. Ex. J at 78-87.)

Actual sales goals, by contrast, are set for each store on a monthly basis by each DM, taking into

account the store's sales trend, size, location and multiple other individual factors.

**Mischaracterization**:  "It is Sprint's policy to formally discipline any employee who

permits a Retail Consultant to work overtime when it has not been authorized in advance."  (Pl.

FLSA Br. at 7.)  "When Retail Consultants fail to meet their assigned sales quotas, they are

counseled by Sprint . . . Repeated failure to meet a sales quota leads to termination."  (<u>Id</u>.)

**Actual Evidence**:  None of the evidence cited by Eng-Hatcher supports her description

of Sprint's corrective-action policy.  Instead, it all shows that corrective action is discretionary—

not mandatory—and is applied only after repeated violations of Sprint's overtime or performance

policies.  Mr. Galluccio testified that, theoretically, an employee who permits an RSC to work

unauthorized overtime "[c]ould" be subjected to corrective action, not that the employee

necessarily would.  (Hurst Dec. Ex. 5 (Galluccio Dep.) at 78; <u>see also</u> Wells Dec. Ex. K ("Any

employee who allows or requires a non-exempt employee to work beyond time which has been .

. . authorized in advance <u>may</u> be subject to discipline.") (emphasis added).)[24]  Mr. Bailey

likewise testified that an employee "might" be subjected to corrective action for a sustained

failure to meet sales goals, but only after a long counseling and coaching process to help the

employee hit her goals.  (Hurst Dec. Ex. 36 (Bailey Dep.) at 36.)[25]  Indeed, just as an employee

who repeatedly works unauthorized overtime may be disciplined, an SM who forced an

---

[24] (<u>See also</u> Hurst Dec. Ex. 21 (Sept. 25, 2003 e-mail from Steve Geldmacher) ("We can take steps to discipline the employee for failing to obtain prior approval (<u>if repeat offenses make this necessary</u>) . . .") (emphasis added).)

[25] (<u>See also</u> Hurst Dec. Ex. 16 (Mar. 2005 Employee Handbook) at 21 (providing that corrective action is "subject to management discretion").)

employee to work unrecorded overtime hours may be disciplined for violating Sprint's overtime and off-the-clock policies. (See Wells Dec. Ex. K.) There is nothing revolutionary—or unlawful—about an employer disciplining an employee who repeatedly violates any corporate policy, including those relating to pay.

In a retail environment, where the needs and resources of a particular store can change very quickly, giving managers this kind of discretion makes sense. An employee, for example, may need to work overtime because one of his co-workers does not show up for work, but the employee may not have time to seek his manager's approval before doing so. It would not make sense to discipline either the employee or the manager in such a situation. (Hurst Dec. Ex. 4 (Dixon Dep.) at 46.)

**Mischaracterizations**: "[D]uring the relevant time period, Defendant maintained Hotlines to respond to complaints regarding, inter alia, Sprint's failure to pay Retail Consultants for all the hours they worked." (Pl. FLSA Br. at 11 (citing Lynch Dep. at 72-73, 80-81).) "[A]s demonstrated by the documents produced by Defendant to date, this problem [of employees complaining about their paychecks not accurately reflecting all hours they worked] is pervasive." (Pl. FLSA Br. at 10-11 (citing Wells Dec. Ex. L (tickets from employee helpline calls).)

**Actual Evidence**: These two statements concern Sprint's Employee Helpline and Ethics Hotline. Mr. Lynch testified about both lines, and, contrary to Eng-Hatcher's suggestion, his testimony makes clear that, although employees can call the Helpline and the Hotline with questions about their payroll, neither line is limited to that topic. Employees could call the Helpline about any employment-related question, and they could call the Hotline to report any unethical behavior. (Hurst Dec. Ex. 33 (Lynch Dep.) at 80-81.) As the call records from the Helpline show, employees often call with routine questions about their paycheck. (See Wells

21

Dec. Ex. L at 7 (ticket 1104004) (call from employee whose time was entered late); id. at 8 (ticket 1125738) (call regarding direct deposit); id. at 15 (ticket 1057340) (call regarding a check that was mailed to the wrong address).)

This leads to Eng-Hatcher's second statement:  that the calls show a "pervasive" problem of employees not being paid for the hours they work.  It is telling, however, that she does not identify any particular calls that show this alleged problem.  That is because none of the calls show any problem at all; in fact, they are evidence of Sprint's efforts to prevent employees from not being paid for the hours they work.  The calls are from employees who believe there is a problem with their paycheck and who are, with Sprint's help, trying to get that problem fixed. This evidence speaks for itself—showing that Sprint has put in place proper checks to ensure that its employees are paid appropriately.  (See, e.g., Wells Dec. Ex. L at 78 (ticket 1124326) (call by supervisor about her retail store consultant not being paid for hours worked.  Time report run and off-cycle check cut to be paid by Friday) id. at 8 (ticket 1131003) (advising Retail Store Consultant that, because his hours were entered late, he would receive an off-cycle paycheck to make up for his missing hours); id. at 853 (sending off-cycle check after retail store consultant called about missing time); id. at 1001 (sending off-cycle check after retail store consultant called about missing time); id. at 1068 (call by Helen Rosario about missing time which was caused by IT problem and off-cycle check sent).)

Plaintiff cannot create evidence by misconstruing testimony or documents.  For the reasons set forth below, Plaintiff's motions for collective and class certification should be denied.

## IV.  ARGUMENT AND CITATION OF LEGAL AUTHORITIES

Plaintiff has asked the Court to certify two classes:  (1) a nationwide FLSA collective action of hourly non-exempt retail store employees, and (2) a New York Rule 23 class of hourly non-exempt retail store employees.[26]  Because Plaintiff can satisfy neither the requirements of the FLSA nor those of Rule 23, Plaintiff's motions should be denied.

**A.    Plaintiff has Failed to Satisfy the FLSA's Standards for Conditional Certification Because She has not Shown that She is Similarly Situated to Her Putative Class.**

In order to show that she is similarly situated to her putative class, at a minimum, she must show that she and other potential plaintiffs were victims of a common illegal policy. Plaintiff has presented no evidence at all of an illegal policy that would support issuing nationwide notice to thousands of current and former hourly retail employees.  All that Plaintiff has presented, in fact, is evidence that Sprint has two legal policies—a policy of paying some of its retail employees commissions, and a policy of, at times, trying to control its expenses.  From these two legal policies, Plaintiff theorizes that an illegal result somehow arises—the failure to pay retail employees for all hours worked.  This theory of "two rights making a wrong," however, is just that—a theory; Plaintiff has presented no actual evidence in support of it.

This lack of evidence of an actual illegal policy is telling.  The Court gave Plaintiff four months of discovery to try to find some evidence in support of conditional certification.  But in those four months, Plaintiff found nothing that indicates any sort of actual nationwide policy or plan of denying hourly retail employees pay for all hours worked, including overtime.[27]  This is

---

[26] Although she filed a separate motion with respect to each class, Plaintiff relied on the same fact section for each motion.  For the Court's convenience, Defendants address both motions in this response.

[27] Plaintiff cannot recover under the FLSA for "pure gap time claims" (i.e., non-overtime hours worked for which minimum wage has been paid).  See Monahan v. County of Chesterfield, 95 F.3d 1263, 1284 (4th Cir. 1996); U.S. v. Klinghoffer Bros. Realty Corp., 285 F.2d 487, 490 (2d

because Sprint does not and has never had such a policy. Rather, all of the evidence shows (1) that during the relevant time period, Sprint's policy has been to pay its employees appropriately for all hours worked, and (2) that Sprint has, in fact, paid its employees for a substantial amount of overtime. This may explain why, almost a year after she originally filed this lawsuit, Plaintiff has not found even one other person who is interested in joining or supporting her claims.

Plaintiff nevertheless insists that the Court should conditionally certify a nationwide class because the certification standard under the FLSA is "extremely lenient." The standard may be "lenient," but it is not non-existent—and that is especially so where, as here, Plaintiff has had ample opportunity to discover evidence of other similarly situated individuals. Because Plaintiff has presented no evidence of an illegal policy, she can satisfy no standard—"lenient" or otherwise. Plaintiff's FLSA motion should therefore be denied.

## 1.    The Standards for Conditional Certification Under the FLSA.

### a.    Plaintiff's contention that the Court should apply an "extremely lenient" standard ignores the Court's discovery plan.

Plaintiff describes the FLSA's conditional certification standard as "extremely lenient." (Pl. FLSA Br. at 13.) Although she cites a number of cases in support of this statement, Plaintiff's description of the standard completely ignores the Court's management of discovery in this case.

On February 29, 2008, the Court set a discovery and briefing schedule that bifurcated discovery, giving Plaintiff a four-month discovery period to gather evidence in support of her

---

Cir. 1960). It is unclear whether Plaintiff is asserting gap time claims with respect to her FLSA collective action but if she is, such claims, self-evidently, cannot be certified.

conditional certification motion.[28]  The Court ordered that all discovery with respect to the issue

of whether Plaintiff was similarly situated to other prospective plaintiffs must be completed

within the four-month time frame.[29]  (2/29/08 Scheduling Order (Docket No. 26).)

Plaintiff now ignores the Court's discovery plan, arguing that under her "extremely

lenient standard" she need present nothing more than her own allegations to warrant sending

notice to a nationwide putative class of thousands of hourly retail store employees.  (Pl. FLSA

Br. at 1.)  Indeed, Plaintiff has had four months to gather evidence to show that she is similarly

situated to Sprint's retail employees in 43 states under thousands of different managers and in

different stores and circumstances, but she was only able to come up with her personal

experiences in two stores in New York City from July 2004 to December 2005.  If this were all

that is required of Plaintiff, as she claims, then the four-month discovery period was unnecessary

and a waste of time.

Although Plaintiff string-cites a myriad of cases in support of her description of the

standard as "extremely lenient," they are all inapposite:  Not one of them involved a court-

ordered discovery plan that, like here, gave the plaintiff a defined discovery period to gather

information to show the court that she is similarly situated to her putative class.[30]  Plaintiff,

---

[28] Originally, this discovery period was to end by May 21, 2008.  (2/29/08 Scheduling Order
(Docket No. 26).)  At Plaintiff's request, the Court later granted a one month extension of the
discovery schedule, requiring completion of discovery by June 20, 2008.  (5/20/08 Scheduling
Order (Docket No. 32).)

[29] The Court also set the same discovery and briefing schedule for Plaintiff's Rule 23 class
claims.

[30] Additionally, all of Plaintiff's cases were at the early stages of discovery.  See Hoffman v.
Sbarro, Inc., 982 F. Supp. 249, 261 (S.D.N.Y. 1997) (utilizing the lenient standard where "little
discovery" had been taken); Mentor v. Imperial Parking Sys., Inc., 246 F.R.D. 178 (S.D.N.Y.
2007) (utilizing first stage lenient standard where parties where in the early stages of litigation);

therefore, cannot simply rest on her own allegations and claim she has satisfied the similarly

situated standard because the standard is "extremely lenient."

> **b.**    **For the Court to conditionally certify Plaintiff's class, she must make a factual showing that she and other similarly situated individuals were victims of a common illegal policy.**

This Court has discretion to determine whether a case brought under 29 U.S.C. § 216(b)

should be conditionally certified as a collective action and whether notice should be sent to

putative class members. <u>Prizmic v. Armour, Inc.</u>, 2006 U.S. Dist. LEXIS 42627, at *4 (E.D.N.Y.

June 12, 2006). "The threshold issue in deciding whether to authorize class notice . . . is whether

plaintiffs have demonstrated that potential class members are 'similarly situated.'" <u>Id</u>. Plaintiff

has the burden of proving she has met this requirement. <u>Diaz v. Elec. Boutique of Am., Inc</u>,

2005 U.S. Dist. LEXIS 30382, at *10 (W.D.N.Y. Oct. 17, 2005).

To meet her burden, Plaintiff must "make a modest <u>factual showing</u> sufficient to

demonstrate that [she] and potential plaintiffs together were victims of a <u>common policy or plan</u>

<u>that violated the law</u>." <u>Id</u>. (emphasis added); <u>Prizmic</u>, 2006 U.S. Dist. LEXIS 42627, at *5;

<u>Morales v. Plantworks, Inc.</u>, 2006 U.S. Dist. LEXIS 4267, at *2 (S.D.N.Y. Feb. 1, 2006); <u>Seever</u>

<u>v. Carrols Corp.</u>, No. 02-cv-6580L (W.D.N.Y. Dec. 12, 2007). Courts have held that this

requires a showing of a "factual nexus" between the named plaintiff's situation and "the

situations of other current and former employees whom plaintiffs seek to join" to the collective

action. <u>Diaz</u>, 2005 U.S. Dist. LEXIS 30382, at *10; <u>see also</u> <u>Prizmic</u>, 2006 U.S. Dist. LEXIS

42627, at *4.

---

<u>Iglesias-Mendoza v. La Belle Farm, Inc.</u>, 239 F.R.D. 363, 368 (S.D.N.Y. 2007) (noting that "[o]nly very limited discovery" had taken place); <u>Realite v. Ark Rest. Corp.</u>, 7 F. Supp. 2d 303, 307-08 (S.D.N.Y. 1998) (noting that "[f]ar too little discovery" had been taken to go beyond first stage); <u>Hallisey v. Am. Online, Inc.</u>, 2008 WL 465112 (S.D.N.Y. Feb. 19, 2008) (noting that not enough discovery had been taken to move to the second stage).